# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _____  01  0369

CIV-MIDDLEBROOKS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JEROME E. ROSEN, DIVERSIFIED | ) |
| CORPORATE CONSULTING GROUP, | ) |
| JOSEPH D. RADCLIFFE and | ) |
| WILLIAM A. CALVO III, | ) |
| | ) |
| Defendants. | ) |

MAGISTRATE JUDGE
BANDSTRA

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges:

## SUMMARY

1.      This case involves a fraudulent scheme to manipulate the market for the securities of Software of Excellence, Inc., a.k.a., Systems of Excellence, Inc. ("SOE") by Jerome E. Rosen ("Rosen"), a well-known penny stock trader based in south Florida; Joseph D. Radcliffe ("Radcliffe"), a former stockbroker; and Diversified Corporate Consulting Group ("Diversified"), a corporation controlled by Radcliffe and William A. Calvo III ("Calvo"). This scheme also included the unlawful resale of SOE securities through unregistered, non-exempt transactions by Rosen, Radcliffe, Diversified, and Calvo.

2.    At all relevant times, SOE securities were quoted on the National Association of Securities Dealers' OTC Bulletin Board.  Rosen's employer, J. Alexander Securities, Inc., made a market in SOE stock, and Rosen was the trader exclusively responsible for the firm's market making activity in SOE.

3.    Rosen's primary role in the manipulation, which involved the participation of numerous individuals, including Radcliffe and Diversified, was to support the share price of SOE by controlling the supply of stock into the market, thereby preventing the economic forces of supply and demand from establishing a legitimate price for SOE stock and causing unsuspecting investors to pay higher prices for SOE stock.

4.    As payment for his role in the manipulation, Rosen received a total of 850,000 shares of facially-unrestricted SOE stock from three sources:  (i) the issuer, through the presentation of bogus Form S-8 registration statements to the company's transfer agent, (ii) a nominee of SOE chairman Charles O. Huttoe ("Huttoe"), and (iii) Radcliffe and Diversified.  At Rosen's direction, these shares were delivered into two nominee accounts in the name of Osvaldo Frisselli, Jr.

5.    Rosen and/or Radcliffe then directed the unregistered resale of these shares from the two Frisselli nominee accounts, yielding profits of $503,496.  Rosen shared a portion of these unlawful profits with a co-conspirator, Sheldon Kraft, and also transferred funds to a company closely associated with Radcliffe.  Rosen used the remaining proceeds for his benefit and for the benefit of several family members.

6.    Rosen engaged in additional fraudulent market making activity as a result of his access to others involved in the manipulation, including both Huttoe and Theodore Melcher, a part-owner of Diversified who touted SOE in the widely followed "SGA Goldstar Whisper Stocks"

newsletter.

7.      Huttoe gave Rosen advance notice of all SOE press releases and Melcher tipped Rosen in advance of touts issued in the SGA Goldstar Whisper Stocks newsletter.

8.      By knowing when Melcher would publish favorable comments or when SOE intended to prime the market with a misleading press release – and using an exclusive access to a supply of SOE stock controlled by Diversified and others – Rosen engaged in near risk-free trading.

9.      In other instances, Rosen and Radcliffe would jointly call Melcher and direct him to tout SOE on a specific day.  Rosen, knowing when a tout would be issued, would then trade in advance of the tout he directed, a practice known as "scalping."

10.     As a result of his fraudulent trading, during the period December 1, 1995 through September 30, 1996, Rosen earned $112,468 in compensation as his share of trading profits from his SOE market-making activities at J. Alexander Securities, Inc.

11.     At the same time that Rosen was manipulating the market for SOE stock, Diversified, Radcliffe and Calvo were engaging in the unregistered, non-exempt resale of SOE stock.

12.     Between January and October 1996, Radcliffe and Calvo caused Diversified to resell 1,375,000 shares of SOE stock in a series of unregistered, non-exempt transactions, for unlawful profits totaling $2,457,118.

13.     Rosen, Radcliffe and Diversified, directly or indirectly, have engaged, are engaged or are about to engage in acts, practices and courses of business that have constituted, constitute or will constitute violations of the antifraud provisions contained in Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17

C.F.R. §§ 240.10b-5], and unless enjoined, are likely to do so in the future.

       14.     Rosen, Radcliffe, Calvo and Diversified, directly or indirectly, have engaged, are

engaged or are about to engage in acts, practices and courses of business that have constituted,

constitute or will constitute violations of the securities registration provisions of the federal

securities laws, specifically, Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities

Act") [15 U.S.C. §§ 77e(a) and 77e(c)], and unless enjoined, are likely to do so in the future.

## JURISDICTION

       15.     This Court has jurisdiction of this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)], and Sections 21 and 27 of the Exchange Act [15 U.S.C.

§§ 78u and 78aa].

       16.     The Commission brings this action pursuant to authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Sections 21(d) and 21(e) of the

Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

       17.     Defendants, directly or indirectly, used the means and instrumentalities of

interstate commerce, or of the mails, or of the facilities of a national securities exchange in

connection with the acts, practices, and courses of business alleged herein.

## DEFENDANTS

       18.     **Jerome E. ("Jerry") Rosen**, age 47, has been registered with the National

Association of Securities Dealers ("NASD") since 1975, and is a trader working at a branch office

of J. Alexander Securities, Inc. ("J. Alexander") in Aventura, Florida.  Rosen was married to

Suzane Frisselli, although she lived in Brazil, during the relevant time.  Rosen has a long

disciplinary history dating back to his first days in the industry.  In 1980, Rosen consented, without

admitting or denying the Commission's allegations, to the entry of a final judgment of permanent

injunction against willful violations of Sections 5(a) and 5(c) of the Securities Act and was

suspended for 14 days.  In 1991, Rosen was censured and fined $5,000 by the NASD for excessive

markup violations.  In July 2000, the NASD charged that Rosen had harassed another market maker

in violation of NASD Conduct Rule 2110, fined him $32,000 and suspended him from association

with a member firm for ten days.  Also in July 2000, Rosen received a Preliminary Determination

Letter from the NASD alleging violations of Section 10(b) of the Exchange Act, Rule 10b-5,

multiple NASD Conduct Rules and an NASD Procedure Rule.

     19.     **Diversified Corporate Consulting Group**, a Florida limited liability company

formed in May 1995, was controlled at all relevant times by Radcliffe and Calvo.  Diversified

entered into a contract with SOE in January 1996 under which Diversified variously agreed to

recruit market makers, a financial public relations firm and retail brokerage firms to market the

stock.

     20.     **Joseph D. Radcliffe**, age 53, resides in Kingston, New York and is a former

stockbroker who worked at Vanderbilt Securities in 1987 and 1988 along with Rosen.  Radcliffe

is a co-owner and control person of Diversified.

     21.     **William A. Calvo III**, age 53, is an attorney who resides in Ocala, Florida, and is

a co-owner and control person of Diversified.  Calvo had signatory authority over all of

Diversified's bank accounts and brokerage accounts, and ratified Diversified's unregistered

resales of SOE shares.  Calvo also authorized Radcliffe to conduct trades in Diversified's

brokerage accounts and provided written authorization for Radcliffe to transfer SOE shares to Rosen's nominee. In 1988, Calvo was permanently enjoined from violating Section 17(a) of the Securities Act, Sections 10(b) and 15(c) of the Exchange Act, and Rules 10b-5, 10b-9 and 15c2-4 thereunder in connection with a public offering of stock in The Electronics Warehouse. Effective January 15, 1994, Calvo was disbarred from the practice of law in Florida for his actions in connection with The Electronics Warehouse offering.

## OTHER RELATED INDIVIDUALS AND ENTITIES

22.    **Systems of Excellence, Inc.** ("SOE"), formerly Software of Excellence, Inc., was a Florida corporation that, at the relevant time, billed itself as a provider of software intended for use in dental offices. Later, through its acquisition of ICMX Federal Systems, SOE purportedly engaged in the business of manufacturing and distributing video teleconferencing equipment. On May 30, 2000, the Commission deregistered the securities of SOE pursuant to Section 12(j) of the Exchange Act. SOE is currently in bankruptcy liquidation proceedings.

23.    **Osvaldo Frisselli, Jr.** ("Frisselli"), age 38, was at all relevant times Rosen's brother-in-law (the brother of Rosen's now ex-wife Suzane Frisselli) and resides in Sao Paulo, Brazil. Rosen and Radcliffe both used Frisselli's name to establish nominee brokerage accounts for Rosen.

24.    **Charles O. Huttoe** ("Huttoe"), age 53, is the former chairman and CEO of SOE. On November 7, 1996, in an action styled SEC v. Huttoe, et al., Civ. Act. No. 96-2543 (GK) (D.D.C.), the Commission alleged violations of the federal securities laws for Huttoe's role in the massive fraud involving SOE, which he resolved by consenting to, among other things, the entry of a permanent injunction. Huttoe also pled guilty to one count of securities fraud and one count of money laundering arising from his conduct at SOE.

- 6 -

25.     **Sheldon Kraft** ("Kraft"), age 49, is a former stockbroker.  On January 14, 1998, Kraft consented to the entry of an order of permanent injunction and other relief arising from his role in the SOE fraud, in an action styled <u>SEC v. Kraft</u>, Civ. Act. No. 98-0095 (GK) (D.D.C.). Kraft also pled guilty to one count of conspiracy to commit securities fraud and money laundering, and one count of failure to file tax returns.  The Commission also barred Kraft from the securities industry.  Rosen and Kraft worked together in the early 1990's at Emanuel and Company in New York, NY.

26.     **Theodore R. Melcher, Jr**. ("Melcher"), age 55, was the owner of SGA Goldstar Research, Inc., a company that published a daily tout sheet called the SGA Goldstar Whisper Stocks newsletter.  During at least part of the relevant time, Melcher was also a co-owner of Diversified, with Radcliffe and Calvo.  On September 12, 1997, Melcher was sentenced to 12 months incarceration and two years supervised release, and ordered to pay a $20,000 fine, after pleading guilty to a two-count criminal information charging him with violations of the federal securities laws relating to his role in the SOE fraud.

## FACTS

**A.     Background:  The Initial Fraudulent Scheme**

27.     In early 1995, Huttoe met Kraft, who had been described to Huttoe as a "power stockbroker" capable of aggressively marketing penny stocks to other brokers and to investors. Software of Excellence, as SOE was then known, had only one operating business, a software application intended for use in dental offices, and that business was failing.  Huttoe approached Kraft in an attempt to salvage the company, and Kraft agreed to assist Huttoe by introducing SOE to Kraft's "total world" of brokers and promoters.

28.     As the relationship between the two progressed, Huttoe began issuing millions of facially-unrestricted shares to himself, to Kraft, and to their respective nominees, in violation of the registration provisions of the federal securities laws.

29.     Huttoe carried out this distribution by causing bogus Form S-8 registration statements to be presented to SOE's transfer agent, with instructions to issue the requested certificates without a restrictive legend.  The registration statements falsely reflected on their covers that they had been filed with the Commission, when, in fact, they had not been, nor were they filed with the Commission by the time the transfer agent issued the shares.

30.     Given SOE's failing business, Kraft advised Huttoe to treat SOE as a shell and to "find something to put into it."  To that end, in November 1995, Kraft, acting through a brokerage client, introduced SOE to an acquisition candidate, ICMX Federal Systems, Inc. ("ICMX"), a small company that claimed to manufacture a breakthrough video teleconferencing technology.

31.     Huttoe and Kraft soon set out to have SOE acquire ICMX in an all-stock transaction and, with something to then tout, simultaneously began to enlist the services of numerous individuals to expand their fraudulent scheme.

**B.      Huttoe Recruits Rosen Into the Fraudulent Scheme**

32.     By November of 1995, when Huttoe and Kraft were working to have SOE acquire ICMX, Rosen had long since been the J. Alexander trader responsible for the firm's market making activity in SOE.  Huttoe felt that Rosen's bearish trading of SOE would hurt his and Kraft's plans to further manipulate SOE, so he arranged, through Kraft, to meet Rosen for the purpose of bribing Rosen into actively participating in the next phase of the manipulative scheme.

- 8 -

33.     In or around November 1995, Kraft, Huttoe, and Michelle Sotnikow, an associate of Kraft's and a participant in the fraud, met Rosen for dinner in south Florida.  While at dinner, Huttoe asked Rosen what it would take for Rosen to stop "leaning" on SOE's stock.

34.     Rosen, who was already aware of the pending ICMX merger and of Kraft's involvement with the company, told Huttoe that he would not only stop "leaning" on the stock but that he could also "help make the stock do better," as long as Huttoe would make it financially meaningful for Rosen to switch sides and start "supporting" the stock price.

35.     Rosen and Huttoe reached an agreement where Huttoe would pay Rosen off with SOE stock, in exchange for which Rosen would support the price of SOE stock by whatever means necessary, including pitching the stock to other broker-dealers, holding long positions when appropriate, being on the high side of the Bid, misleading the market with his Bid and Ask quotations, and, according to Huttoe, "generally maintaining an illusion of strength."  Huttoe agreed to compensate Rosen by issuing SOE stock in the name of Osvaldo Frisselli, Jr., Rosen's then brother-in-law and nominee.

36.     Unbeknownst to Huttoe at the time, Kraft had demanded that Rosen split the proceeds of his stock payoff with Kraft as payment for being introduced to Huttoe.  Rosen readily accepted Kraft's stipulation.

37.     Within days of their dinner meeting, Rosen asked if Kraft would "protect" him by selling SOE stock to J. Alexander whenever Rosen needed it.  Initially uncertain, Kraft soon agreed to "protect" Rosen after learning that Huttoe had opened several nominee accounts at Commonwealth Associates ("Commonwealth") – Kraft's employer at the time – and had deposited several million SOE shares into those new accounts, giving Kraft trading discretion.

38.     This arrangement with Kraft gave Rosen the ability to short sell SOE stock (*i.e.* sell stock into the market that Rosen did not own) with impunity, knowing that he could cover his short sales at an advantageous price with stock supplied by Kraft.  Accordingly, beginning on or about November 30, 1995, Rosen began covering his selling activity by periodically contacting Kraft during the trading day and arranging to buy large blocks of SOE stock from Kraft-controlled accounts at Commonwealth.

39.     By November 30, 1995, the requisite elements of Rosen's participation in this new phase of the SOE manipulation were in place.  Rosen had "switched sides," had secured an exclusive supply of stock to support his trading, and had reached agreement with Huttoe on the terms of a payoff.

40.     As Rosen began to support the price of the stock through his trading activity, Kraft and Huttoe started drumming up demand-side interest in SOE and its soon-to-be-acquired technology.

**C.      Rosen Receives First Payoff; Huttoe Issues Materially False and Misleading Press Releases to Stimulate Demand for SOE Stock**

41.     On December 6, 1995, Huttoe made good on his arrangement with Rosen and caused SOE to issue 100,000 facially-unrestricted shares in the name of Rosen's nominee, Frisselli.  At Rosen's direction, these shares were delivered into Frisselli's account at Litwin Securities, Inc. ("Litwin") on December 20, 1995.

42.     On December 11, 1995, SOE issued a press release that discussed its pending acquisition of ICMX and ICMX's purported cutting-edge technology.  The press release touted ICMX as a "technology company specializing in advanced visual communication solutions" and

claimed that ICMX had a video-teleconferencing product that operated at 30 frames per second, far better than the industry standard of 12 frames per second. The release further stated, "ICMX has already booked $10 million in sales for 1996."

43.     SOE's December 11, 1995 press release was materially false and misleading. Neither at the time of the announcement, nor at any time, did ICMX (or SOE) have revenues or purchase orders of that magnitude.

44.     On December 14, 1995, in addition to his access to SOE shares from Kraft-controlled accounts at Commonwealth, Rosen began covering his trading activity by purchasing stock from his nominee account at Litwin – even though those shares were not actually delivered into the account until December 20.

45.     Rosen was able to easily effect many of these transactions because Dennis Sturm, the account representative for Frisselli's account at Litwin, was also a part-time J. Alexander employee and shared office space with Rosen.

46.     Rosen would hold up the phone and yell across the room to Sturm, indicating that he had Frisselli on the line from Brazil and that Frisselli wanted to sell some of his SOE stock. Sturm would get on the line and take the order from an imposter holding himself out to be Frisselli.

47.     On December 26, 1995, SOE issued another materially false and misleading press release in a continuing effort to create buy-side interest in SOE stock. Not only did this release reiterate the claim that ICMX had previously received purchase orders of $10 million, but the release also stated that SOE had just received a new $700,000 order from the U.S. State Department. Neither statement was true.

**D.    Rosen Demands More Stock from Huttoe**

48.    In or around late December 1995 or early January 1996, about a month or so after their first dinner meeting, Huttoe again met Rosen for dinner in Florida.  At dinner, Rosen disclosed his arrangement with Kraft to split the Frisselli proceeds, and then demanded more stock from Huttoe.

49.    Rosen also enlisted Kraft's assistance to help convince Huttoe that Rosen deserved more SOE stock for his efforts.

50.    Huttoe relented and, in a series of four transactions between January 8, 1996 and February 6, 1996, caused another 650,000 SOE shares to be delivered into the Frisselli account at Litwin Securities.

51.    As these shares became available (and as he had done before), Rosen directed the sale of SOE stock from Frisselli's account at Litwin by shouting across the office to Dennis Sturm to take a sell order from someone on the phone claiming to be Osvaldo Frisselli.

**E.    Rosen Introduces Diversified and Melcher to the Scheme**

52.    In late December 1995 or early January 1996, Rosen introduced Huttoe to Radcliffe and Diversified.  Rosen convinced Huttoe that Diversified could help promote SOE stock, especially by reason of Radcliffe's relationship with Melcher, the publisher of an influential penny stock tout sheet and co-owner of Diversified.

53.    Melcher had an agreement with Radcliffe to cover Radcliffe-promoted companies in Melcher's SGA Goldstar Whisper Stocks newsletter.

54.     On January 16, 1996, once Melcher had agreed to cover SOE in his newsletter, Calvo, acting on behalf of Diversified, signed a "consulting" agreement with SOE, pursuant to which SOE agreed to give Diversified 1,800,000 shares of stock.

55.     Huttoe directed SOE to issue all 1,800,000 shares pursuant to three bogus Form S-8 registration statements.  These shares were delivered into Diversified's account at Kingston Securities Corp. ("Kingston").

56.     Shortly thereafter, Melcher issued SGA Goldstar's first tout of SOE after the markets closed on January 22, 1996.

57.     On January 23, 1996, as demand soared in response to SGA Goldstar's initial coverage of SOE and its alleged breakthrough technology, Radcliffe began directing Diversified's account representative at Kingston to sell SOE shares to Rosen at J. Alexander.

58.     In fact, over the course of the next several months, nearly every SOE share (96%) sold from Diversified's Kingston account was sold to Rosen at J. Alexander.  Calvo ratified these trades.

F.      **Nature of the Market for OTC Securities:  How Market Makers Compete and Establish the Price of Securities**

59.     In a competitive market, the forces of supply and demand determine the market price for a security.  When the supply of a security exceeds the demand, the price of the security generally declines.  When the demand for a security exceeds the supply, the price of the security generally increases.

60.     Unlike a so-called "listed" security, where shares are traded through a specialist on the floor of a national securities exchange, SOE securities were traded via the NASD OTC Bulletin

Board. The OTC Bulletin Board has no physical location or trading floor; rather, it is a computerized network of broker-dealers who communicate their willingness to buy and sell a given security by entering quotes on their computer terminals, for other broker-dealers to view.

61.    Securities quoted on the OTC Bulletin Board are traded through "market makers." Market makers are broker-dealers who, with respect to a security, hold themselves out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for their own account on a regular or continuous basis, thus "making a market" in that particular security.

62.    Market makers, acting competitively and independently of each other, submit "Bid" and "Ask" quotations into an inter-dealer communications network as they compete for orders from investors and broker-dealers. The quotations signal to the market each market maker's interest in either buying or selling a security. A market maker drops its Ask quotation when it wants to sell a security and raises its Bid quotation when it wants to buy a security. Market makers make their profit on the spread between the Bid and the Ask.

63.    At any given time, the highest Bid quotation coupled with the lowest Ask quotation forms what is called the "inside market." NASD rules require retail customer orders to be executed at the inside market price, which is sometimes referred to as the "prevailing market price" or the National Best Bid and Offer ("NBBO"). The inside market changes throughout the trading day as market makers change their quotations based on order flow and the orders they execute.

64.    When one market maker continually increases the inside Bid quotation for a security, it signals to the market that demand for a security exceeds supply, and the price for that security goes up.

65.     Market makers ordinarily attempt to end each trading day "flat" (*i.e.*, without an inventory that they must carry overnight) and therefore limit trading risk. One way for a market maker to accomplish this is to adjust its Bid and Ask quotations to attract buyers and sellers, and thereby balance purchase and sale transactions throughout the trading day.

**G.     Mechanics of the Manipulation:  How Rosen's Fraudulent Trading Affected the Market for SOE Stock**

66.     Rosen's strategy for manipulating the market for SOE stock required having a considerable supply of SOE stock for his exclusive purchase whenever he needed. By securing a guaranteed source of stock at favorable prices, Rosen could:  (a) prevent the forces of supply and demand from determining a legitimate market price, and (b) virtually eliminate his trading risk.

*Rosen Gains Access To An Exclusive Supply of Stock From Three Sources*

67.     Rosen conspired with Kraft, Huttoe, and Radcliffe to establish an exclusive supply of SOE stock from three broker-dealers:  Commonwealth, Litwin and Kingston, which at the time cleared through Cantella & Co. ("Cantella").

68.     Rosen's first source was Commonwealth, where Kraft worked and controlled millions of SOE shares in various customer accounts, some in accounts of Huttoe's nominees and others in accounts of other individuals that received SOE shares issued pursuant to bogus Form S-8 registration statements. Kraft, the broker, had authority to sell shares out of these accounts, and granted Rosen access to these shares beginning on or around November 30, 1995.

69.     Rosen's second source of stock was Litwin, where Rosen maintained a nominee account that received, through a series of transactions, Rosen's 750,000-share payoff from Huttoe. Kraft also maintained a nominee account at Litwin, in the name of his wife, that received 400,000

shares of unregistered SOE stock. Rosen began buying stock from these two nominee accounts at Litwin on December 14, 1995.

70.     Rosen's third source of stock was Kingston, where Radcliffe, Rosen's former colleague, maintained accounts – including one in the name of Frisselli – in which Radcliffe directed trading. Radcliffe instructed the account executive, his brother-in-law, to sell directly to Rosen. Rosen gained access to the shares controlled by Radcliffe on January 23, 1996.

71.     In the immediate period preceding Rosen's entry "inside" the manipulation (*i.e.*, from October 2, 1995 through November 29, 1995), less than 20 percent of Rosen's SOE stock purchases came from Commonwealth, and none came from Litwin or Kingston/Cantella.

72.     From November 30 through December 13, 1996 -- the time after Kraft agreed to "protect" Rosen by covering his sales, but before the Frisselli shares became available at Litwin on December 14 -- Commonwealth alone supplied almost 76 percent of Rosen's demand.

73.     From November 30, 1995 through January 22, 1996 -- including the time when Frisselli's shares at Litwin became available (together with Kraft-controlled shares at Commonwealth) but before Radcliffe and Diversified began to supply Rosen on January 23 -- Commonwealth and Litwin provided Rosen with over 81 percent of his demand.

74.     From November 30, 1995 through February 5, 1996 -- including the period after he had access to shares controlled by Radcliffe and Diversified -- Rosen's three sources provided him with over 76 percent of his demand.

### *Rosen's Manipulative Trading*

75.     While Rosen's three exclusive sources of stock speak to pre-arranged trading, those pre-arrangements illuminate only a part of the manipulative scheme. Rosen's frequent and

- 16 -

irrational Bid increases, coupled with his selling activity, particularly to other market makers, demonstrate how he was able to manipulate the market for SOE shares.

76.     During the period of November 30, 1995 through February 5, 1996, for example, Rosen increased the inside Bid quotation more than all the other SOE market makers *combined*.

77.     On numerous occasions, already alone at the inside Bid, Rosen increased his Bid quotations with no buy orders to fill and holding a long position in SOE stock. This conduct was economically irrational because Rosen had no need to purchase stock.

78.     For example, on January 23, 1996, Rosen increased the inside Bid 29 times, including one time when he was long (*i.e.*, holding an inventory) over 200,000 shares.

79.     By moving his Bid in such a manner, Rosen intended to, and did manipulate the market by falsely signaling to other market participants a "need" to acquire stock; a need he did not actually have.

80.     Rosen also increased his Bid quotations to purposefully mislead the market in two other ways. First, before the market opened, Rosen increased his Bid to falsely create the appearance of incoming demand.

81.     Second, Rosen frequently raised the inside Bid at the close of trading -- a fraudulent practice commonly referred to as "marking the close." For example, from January 22 through January 30, 1996, Rosen raised the inside Bid at the close of trading on seven consecutive trading days.

82.     As actual buy-side retail demand for SOE stock came into the market -- induced by SOE's fraudulent press releases and Melcher's touts of SOE in his Whisper Stocks newsletter --

other market makers needed stock to cover the retail demand. Rosen himself had no retail demand to fill because his firm, J. Alexander, had no retail clients.

83.     Acting like a spigot and controlling the supply of stock into the market, Rosen set out to profit off the spread by selling high (at or near the Ask) to other market makers and then buying low (at the Bid) in large blocks from his pre-arranged sources to cover his short sales.

84.     In the period prior to his entry into the manipulative scheme (*i.e.*, before November 30, 1995), Rosen was able to command the Ask price only 27 percent of the time, whereas 40 percent of Rosen's sales were at the Ask during a later period (from November 30, 1995 through February 5, 1996) when he was manipulating the SOE market. This increase, from 27 to 40 percent, in Rosen's ability to demand the Ask price when selling to other market makers reveals that Rosen's sales were not caused by *his need* to sell stock, but by *other market makers' need* to buy stock.

85.     Likewise, prior to November 30, 1995, Rosen was forced to sell low, at the Bid, 22 percent of the time, whereas between November 30 and February 5, only 4 percent of his sales were at the Bid. This decrease, from 22 to 4 percent, in the number of times that Rosen was forced to sell at the Bid to other market makers also reveals that Rosen's sales were not caused by *his need* to sell stock, but *other market makers' need* to buy stock.

86.     To further illustrate Rosen's illicit advantage, from November 30, 1995 through February 5, 1996, Rosen purchased stock from his exclusive sources 75 times, and 56 of those purchases (74.6%) were at *or even below* the inside Bid.

87.     By purchasing stock from Rosen, rather than retail sellers, market makers were forced to buy at or near the Ask of the inside market. This situation increased the trading risk for

the other market makers -- who were often forced to price their subsequent quotes off of the price charged to them by Rosen, or not to compete at all -- while all but eliminating the trading risk for Rosen.

88.     The consequence of Rosen's manipulative trading was that, in addition to virtually guaranteeing a trading profit for himself, Rosen prevented the market from determining a legitimate price for SOE stock. Instead of heeding the winds of supply and demand, and tailoring his Bid and Ask quotations to accurately reflect order flow, Rosen sailed through the trading day by selling stock to other market makers only to cover his sales at favorable prices (*i.e.*, at the Bid or sometimes below) with stock purchased from Kraft, Radcliffe/Diversified or his own nominee account at Litwin.

### *An Illustration:  January 23, 1996*

89.     Illustrative of Rosen's manipulation was his trading on January 23, 1996. Trading volume was particularly heavy that day, which Rosen anticipated because of a "research" report issued by SGA Goldstar the night before. With an almost unlimited supply of stock at his disposal (but not on his books), Rosen set out to quench the incoming retail demand for SOE stock.

90.     The price of SOE stock opened at $0.45 per share, traded to a high of $0.80, and closed at $0.79, with a total of 6,874,500 shares traded. This resulted in a 75.5% increase in price and a 262% increase in trading volume when compared to the prior trading day, January 22, 1996.

91.     Throughout the day, Rosen sold hundreds of thousands of shares to other market makers (*i.e.*, "wholesale" trades), while selling very few shares to broker-dealers to satisfy their retail customers. In the afternoon, while at virtually no risk of having to cover his earlier sales at a

price above cost, Rosen started purchasing stock from his exclusive sources and profiting on the spread.

### Rosen Continues To Utilize His Supply Of Stock

92.     Once SOE began issuing materially false and misleading press releases, and SGA Goldstar started touting SOE stock, trading volume increased significantly.  The average trading volume in December 1995 was 173,795 shares per day, but by late January 1996 trading volume had increased to well over one million shares per day.

93.     This increase in liquidity, coupled with an increase in the float of unregistered shares (SOE continued to fraudulently issue millions of shares of unrestricted stock), eventually diminished the importance of Rosen's role in the manipulation, as competing market makers had more stock available from more sources.

94.     Nevertheless, Rosen, Radcliffe and Diversified continued their fraudulent arrangement until the Commission suspended trading on October 7, 1996.  Between March 28 and September 30, 1996, for example, Radcliffe directed the sale of 700,000 shares of SOE stock, in fifty-four transactions, through two accounts at Kingston, including 580,000 through a Diversified account.  Rosen was on the other side of every single trade.

95.     Clearly Rosen, who continued to reap the fruits of his "insider" status with Huttoe and others, also continued to benefit from an exclusive supply of stock that he could purchase, in large quantities and whenever necessary, without regard to market forces.

### Rosen Trades in Advance of Melcher's Stock Recommendations

96.     It did not take Rosen long to realize that SGA Goldstar's newsletters dramatically affected the market.  Rosen foresaw the potential advantage of knowing, before the market, when

SGA Goldstar would publish one of its SOE touts. Consequently, Rosen initiated a frequent

dialogue with Melcher, the owner of SGA Goldstar.

97.     Rosen called Melcher several times a week, inquiring as to whether SGA Goldstar

would be touting SOE in its daily newsletter. If so, Rosen wanted Melcher to fax him a copy of the

newsletter before the close of the market (SGA Goldstar distributed its newsletter to its subscribers

*after* the close of the market), so that Rosen could trade in advance of the tout, a practice known as

scalping.

98.     Moreover, Rosen, sometimes with Radcliffe on the line, occasionally called

Melcher and they together directed Melcher to publish positive commentary on SOE in the next

day's SGA Goldstar newsletter, which Melcher did. Rosen would then scalp on the tout that he and

Radcliffe directed.

## H.     Rosen is Unlawfully Enriched Through Proceeds From the Sale of Nominee Stock and By Compensation From J. Alexander

99.     As mentioned above, as payment for Rosen's assistance in the fraud, Huttoe caused

550,000 shares of unrestricted SOE stock to be issued in the name of Rosen's nominee, Osvaldo

Frisselli Jr., by sending four separate bogus Form S-8 registration statements to the transfer agent.

100.     The transfer agent issued 100,000 shares on December 6, 1995, 100,000 shares on

January 8, 100,000 shares on January 19, and 250,000 shares on February 6, 1996. All 550,000

unrestricted shares were delivered into Frisselli's brokerage account at Litwin.

101.     The four Forms S-8 were belatedly filed with the Commission on September 24,

1996. Attached to each Form S-8 was a sham "consulting" contract between SOE and Frisselli.

Huttoe created this contract during the weekend of September 21-22, 1996, and in doing so, Huttoe

287661ca6093d2bd

misspelled Frisselli's name, forged Frisselli's signature, and post-dated the contract with a date of December 1, 1996.

102.   An additional 200,000 shares of SOE stock were delivered, at Huttoe's direction, into Frisselli's Litwin account from a stock certificate held in the name of Huttoe's mother, Josephine Brooks.  The transfer agent split the Brook's certificate and issued the 200,000 shares to Frisselli on January 29, 1996.

103.   Rosen also received 100,000 shares of SOE stock from Radcliffe, which were delivered into Frisselli's brokerage account at Kingston on or about January 30, 1996.

104.   In total, Rosen received 850,000 shares of SOE stock -- all delivered into nominee accounts -- for participating in the fraud.

### Rosen Personally Benefits From the Sale of Frisselli's SOE stock

105.   Between December 14, 1995 and February 28, 1996, all 850,000 shares of unrestricted SOE stock delivered into Frisselli's accounts at Litwin and Kingston were sold in 18 separate transactions for proceeds totaling $503,496.  In each instance, Rosen was on the other side of the trade.

106.   Of this amount, $439,825 was wired to a bank account in Frisselli's name at Banco Bradesco.  Then, $197,000 was transferred to a Banco Bradesco account in the name of Rosen's wife, Suzane Frisselli.

107.   At this point, the SOE proceeds were diverted out of the two Frisselli (Osvaldo and Suzane) bank accounts at Banco Bradesco for Rosen's benefit.  For example:

(a)      $204,000, in two separate checks, was sent to a Canadian brokerage account controlled by Kraft as part of Rosen's agreement with Kraft to evenly split the proceeds from Huttoe's payoff to Rosen;

(b)      $37,500, in two checks, was paid to American Express to cover charges for an account in Rosen's name;

(c)      $21,000 paid for a private stock transaction with Ronald Martini that Rosen personally negotiated for his benefit;

(d)      $75,000, in a check made payable to Rosen's mother, Faye Rosen, was deposited into an joint checking account in the name of Faye and Jerome Rosen; and

(e)      $86,000, in a check written to Faye Rosen's companion Benjamin Sgambati, was deposited into an account that Rosen controlled.

108.     In the end, nearly all the proceeds from the sale of SOE stock in Frisselli's securities account were used directly for Rosen's benefit and for the benefit of his family and friends.

### *Rosen Earns $112,468 in Compensation from Making a Market in SOE Stock*

109.     J. Alexander compensated Rosen by evenly splitting his trading profits, after deducting various costs such as order ticket charges. Between December 1, 1995 and September 30, 1996, Rosen grossed profits of $246,876 from trading SOE stock for J. Alexander.

110.     After deducting trading costs directly attributable to SOE, and then splitting the profits with J. Alexander, Rosen earned $112,468 in compensation from fraudulently trading SOE stock.

I.     **Radcliffe, Calvo and Diversified Benefit From Unregistered Resales of SOE Stock**

111.     On January 16, 1996, Diversified entered into a "consulting" contract with SOE, with Calvo signing the agreement on behalf of Diversified.  Pursuant to the contract, Diversified agreed to provide certain services for SOE, including recruiting market makers, a financial public relations firm, and retail brokerage firms to market the stock.

112.     Between January and July 1996, SOE issued 1,800,000 shares to Diversified for its alleged consulting services.  As was the case with the SOE stock issued to Rosen's nominee, Diversified's stock was issued without restrictive legends after Huttoe presented three bogus Form S-8 registration statements to SOE's transfer agent.

113.     The transfer agent issued 1,100,000 shares on January 19, 1996, 600,000 shares on June 5, 1996, and 100,000 shares on July 18, 1996 on stock certificates in Diversified's name.

114.     Diversified delivered these shares into its brokerage account at Kingston, and between January and October 1996, Diversified sold 1,375,000 of those shares through a series of unregistered, non-exempt transactions, for unlawful proceeds totaling $2,457,118.

115.     A portion of the unlawful proceeds were distributed to Radcliffe and Calvo for their personal benefit, and some of the proceeds were used by Diversified for general corporate purposes, including the purchase of a limousine that is still being used by Radcliffe.

116.     Although only Calvo had formal trading authority in Diversified's account, Calvo orally authorized Radcliffe to direct trading in the account.  Radcliffe was the person primarily responsible for directing Diversified's unregistered resales of SOE stock.

117.    Because Radcliffe did not have written authority to trade in the Diversified account, the broker periodically informed Calvo of trade orders (which Calvo ratified), and sent Calvo written confirmations of every trade.

118.    Calvo also executed documents to authorize transfers of Diversified's shares to accounts belonging to various Radcliffe family members and others, including Frisselli, Rosen's nominee.

## COUNT ONE

### Rosen Violated Sections 5(a) and 5(c) of the
### Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]

119.    Paragraphs 1 through 118 are hereby realleged and incorporated by reference.

120.    From December 1995 through at least February 28,1996, Rosen resold 850,000 shares of facially-unrestricted SOE stock through two nominee accounts when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was available.  Rosen earned $503,496 as a result of his unregistered resales.

121.    By reason of the foregoing, defendant Rosen violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT TWO

### Radcliffe, Calvo and Diversified Violated Sections 5(a) and 5(c)
### of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]

122.    Paragraphs 1 through 121 are hereby realleged and incorporated by reference.

123.    From January through October 1996, Diversified, at the direction of Radcliffe and Calvo, resold 1,375,000 shares of facially-unrestricted SOE stock when no registration statement

had been filed or was in effect as to such securities and when no exemption from registration was

available. Diversified, Radcliffe and Calvo earned $2,457,1118 as a result of their unregistered

resales.

124.    By reason of the foregoing, defendants Radcliffe, Calvo and Diversified violated

Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].


### COUNT THREE

**Rosen, Radcliffe and Diversified Violated Section 17(a) of the Securities Act
[15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b),
and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

125.    Paragraphs 1 through 124 are hereby realleged and incorporated by reference.

126.    Rosen, with the participation of Radcliffe and Diversified, manipulated the market

for SOE stock. Rosen increased his Bid quotations to create the false appearance of demand for

SOE stock. Rosen then controlled the supply of SOE stock entering the market – with shares

supplied by Radcliffe, Diversified and others – thereby causing investors to pay higher prices for

SOE stock than they would have paid in a market free from such collusion.

127.    By reason of the foregoing, Rosen, Radcliffe and Diversified violated Section

17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].


### COUNT FOUR

**Rosen Violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)],
Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b),
and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

128.    Paragraphs 1 through 127 are hereby realleged and incorporated by reference.

129.    Between December 1, 1995 and September 30, 1996, Rosen received information from Huttoe and Melcher regarding SOE before that information was publicly disseminated. Huttoe tipped Rosen about upcoming SOE press releases, and Melcher notified Rosen about upcoming SOE touts by SGA Goldstar.  Occasionally, Rosen traded in advance of a tout that he directed.  In addition to the $503,496 that Rosen made from unregistered resales in the two Frisselli nominee accounts, Rosen's participation in this manipulative scheme earned him another $112,468 in compensation (*i.e.,* his split of trading profits) from his market making activities at J. Alexander.

130.    By reason of the foregoing, Rosen violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court issue Orders:

### I.

Permanently enjoining defendant Rosen, and his officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b), of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. §§ 240.10b-5].

### II.

Permanently enjoining defendant Radcliffe, and his officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice by

personal service or otherwise, from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b), of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. §§ 240.10b-5].

### III.

Permanently enjoining defendant Diversified, and its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b), of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. §§ 240.10b-5].

### IV.

Permanently enjoining defendant Calvo, and his officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, from violating, directly or indirectly, Sections 5(a) and 5(c) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a) and 77e(c)].

### V.

Directing Defendant Rosen to disgorge all illegal gains, together with prejudgment interest.

### VI.

Directing all Defendants, and each of them, to jointly and severally disgorge all illegal SOE trading proceeds realized in brokerage accounts that they established, controlled or in which they directed the trading of SOE shares, together with prejudgment interest.

## VII.

Directing all Defendants, and each of them, to pay civil penalties pursuant to Section of

20(d) the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d) of the Exchange Act [15

U.S.C. § 78u(d)].

## VIII.

Granting such other relief as this Court may deem just and proper.


Respectfully submitted,


THOMAS C. NEWKIRK
JACK WORLAND
MARK K. BRASWELL
ERIC R. WERNER
BERNARD MCDONOUGH
Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W., Mail Stop 8-1
Washington, D.C.  20549-0801
Email: worlandj@sec.gov
Dated:  January 30, 2001                              Tel:  202-942-4522 (Worland)
          Washington, D.C.                                FAX:  202-942-9639

JS 44   (Rev. 4/97)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO)

**I.(a) PLAINTIFFS**

SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**

Jerome E. Rosen,
Joseph D. Radcliffe, William A. Calvo III, and
Diversified Corporate Consulting Group

MAGISTRATE JUDGE

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

AO APPEAL 369/DMM/TEB

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.   Miami-Dade

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Jack Worland, Esq.
450 Fifth Street, N.W., Mail Stop 8-8
Washington, DC  20549-0808

Thomas C. Newkirk
Mail Stop 8-1

ATTORNEYS (IF KNOWN)

Herbert Jacobi (Rosen)
8 West 38th Street
New York, NY

Richard Morvillo (Radcliffe)
1001 Pennsylvania Ave., N.W.
Washington, DC  20004

## II. BASIS OF JURISDICTION (PLACE AN ✔ IN ONE BOX ONLY)

☑ 1 U.S. Government
Plaintiff

☐ 2 U.S. Government
Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of
Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN ✔ IN ONE BOX FOR PLAINTIFF

(For diversity cases only)                                     AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "✔" IN ONE BOX ONLY)

☑ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transfered from
Another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to
District Judge from
Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "✔" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☑ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl Ret. Inc Security Act | ☐ 870 Taxes (US Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing | ☐ 530 General | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

15 U.S.C. 77e(a), 77e(c), and 77q(a); 15 U.S.C. 78j(b).  Violations of the securities registration and antifraud provisions of the federal securities laws.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY

DATE

1/30/01

SIGNATURE OF ATTORNEY OF RECORD

Thomas C. Newkirk